UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DONOVAN REAL ESTATE SERVICES LLC,

Plaintiff,

-vs-

LB-UBS 2007-C6-3500 Main Street Station LLC, LB-UBS-
2007-C6-Cortland Station LLC, LB-UBS 2007-C6-D&L
Station LLC, LB-UBS 2007-C6-Henrietta Station LLC, LB-
UBS 2007-C6-Southside Station LLC, and McKinley, Inc.,

Defendants.

---

DECISION AND ORDER

16-CV-6521-CJS-MWP

**APPEARANCES**

For Plaintiff:                    Brian R. Henzel, Esq.
                                  Brian R. Henzel PLLC
                                  P.O. Box 888
                                  Pittsford, NY 14534
                                  (585) 749-1612

                                  Patrick Michael Kane, Esq.
                                  Smith Moore Leatherwood LLP
                                  300 N. Greene Street Suite 1400
                                  Greensboro, NC 27401
                                  (336) 378-5352

For Defendants:                   Joseph Lubertazzi, Jr., Esq.
                                  Peter M. Knob, Esq.
                                  McCarter & English
                                  100 Mulberry Street
                                  Four Gateway Center
                                  Newark, NJ 07102-4056
                                  (973) 622-4444

## INTRODUCTION

**Siragusa, J.** This contract dispute, removed from state court, is before the Court on the following applications relating to the complaint of plaintiff Donovan Real Estate Services, LLC ("Donovan"), which essentially alleges in four causes of action that it is owed brokerage fees. The pending motions are as follows:

1) The motion of defendant, LB-UBS 2007-C6-3500 Main Street Station LLC, hereinafter referred to as the "Amherst Owner," for partial summary judgment on Donovan's claims against it with respect to Tops Markets, LLC ("Tops Amherst");

2) The motion of defendant, LB-UBS 2007-C6-Cortland Station LLC, hereinafter referred to as the "Cortland Owner," for partial summary judgment on Donovan's claims against it with respect to Tops Markets, LLC ("Tops Cortland");

3) The motion of defendant, LB-UBS 2007-C6-D & L Station LLC, hereinafter referred to as the "Depew Owner," for partial summary judgment on Donovan's claims against it with respect to Tops Markets, LLC ("Tops Depew");

4) The motion of Defendant, LB-UBS 2007-C6-Southside Station LLC, hereinafter referred to as the "Jamestown Owner," for partial summary judgment on Donovan's claims against it with respect to Tops Markets, LLC ("Tops Jamestown");[1] and

5) Donovan's cross-motion for summary judgment on all of its claims for brokerage fees against the Amherst, Cortland, Depew and Jamestown owner defendants (hereinafter collectively referred to as the "owner-defendants"), who have moved for partial summary judgment, and against LB-UBS 2007-C6-Henrietta Station LLC, hereinafter referred to as the

---

[1] These will be collectively referred to, *infra*, as the "Tops Transactions."

"Henrietta Owner." Donovan apparently is not seeking summary judgment against Defendant McKinley, Inc. ("McKinley").

For the reasons stated below, each Defendant's application for partial summary judgment is denied in its entirety, and Plaintiff's cross-motion is granted in part, and denied in part.

## BACKGROUND

The salient facts necessary to the resolution of the motions are undisputed and are as follows. In December 2014, the properties at issue were purchased by the owner-defendants listed above. Prior to the owner-defendants' purchase, the previous owners hired McKinley to manage the properties. On April 8, 2013, McKinley hired Donovan and Vanguard-Fine, LLC, as brokers to lease *vacant* space at the properties. Exclusive Leasing Agreement at 1, Jun. 22, 2017, ECF No. 39-6. Once the new owners purchased their respective properties, each hired LNR Partners, LLC ("LNR") to service the properties. In this capacity, on January 20, 2015, LNR, acting on behalf of each of the owner-defendants, entered into an exclusive property management agreement with McKinley. Exclusive Property Management Agreement (Henrietta Plaza), Jun. 16, 2017, ECF No. 38; Exclusive Property Management Agreement (Jamestown), Jun. 16, 2017, ECF No. 38-2; Exclusive Property Management Agreement (Cortland), Jun. 16, 2017, ECF No. 38-4; Exclusive Property Management Agreement (Depew), Jun. 16, 2017, ECF No. 38-6; and Exclusive Property Management Agreement (Amherst), Jun. 16, 2017, ECF No. 38-8. Of significance to the pending motions, in each of the property management agreements, section 8, "Leasing," contains this language: "Intentionally deleted." *Id*. at § 8.

On February 18, 2015, LNR, on behalf of the owner-defendants, entered into what is titled an "Exclusive Property Leasing Agreement" with Donovan for each of the properties at issue. Exclusive Property Leasing Agreement (Depew), Apr. 10, 2017, ECF No. 25-13, *attached as* Ex. A to Edwards Cert.; Exclusive Property Leasing Agreement (Amherst), Apr. 10, 2017, ECF No. 25-14 *attached as* Ex. B to Edwards Cert.; Exclusive Property Leasing Agreement (Cortland), Apr. 10, 2017, ECF No. 25-15, *attached as* Ex. C to Edwards Cert.; Exclusive Property Leasing Agreement (Jamestown), Apr. 10, 2017, ECF No. 25-16 *attached as* Ex. D to Edwards Cert.[2] Each agreement contains the following pertinent language:

> Owner appoints Agent [Donovan] and Agent accepts appointment, on the terms and conditions provided below, *as exclusive leasing agent* of the real estate and improvements known as….

*Id*. at § 1. Section 8 concerns leasing and in pertinent part states as follows:

> (d) Owner agrees to pay Agent a leasing commission equal to **Four Percent (4%)** of the Net Rental Value for the first five (5) years of the initial term of the lease or for any expansion space added to an existing lease. For any lease with a term exceeding five (5) years, the leasing commission shall be equal to **Two Percent (2%)** of the Net Rental Value for years six (6) through ten (10) of the remainder of the initial term. For the purposes of this paragraph, Net Rental Value shall be equal to the gross amount of all sums to be paid by tenant over the applicable period less the amount of rent allocated to tenant improvements performed at Owner's cost above Owner approved leasing parameters, concessions, free rent, moving allowances and other lease incentives and lease operating expense pass-throughs (including, but not limited to, property taxes, insurance, mortgage interest, management fees and other operating expense)….

> **(e)** Should any tenant with a current lease for space at the Property renew or relocate within the Property during the term of this Agreement, Agent shall receive compensation equal to one-half (1 /2) the normal rate as defined in Paragraph 8(d) of this Agreement. Should any tenant with a pre-determined option exercise said option without materially deviating from terms and conditions of said option, Agent shall receive no compensation….

---

[2] Although Brian Donovan testified in his deposition that he also had an exclusive property leasing agreement for the Henrietta location, Donovan Dep. 31:7–1, Apr. 10, 2017, ECF No. 25-9, that agreement was not filed with the motion papers. However, since the Henrietta location does not have a Tops store, it is not a part of the Tops Transactions addressed in the owner-defendants' motions.

Exclusive Property Leasing Agreements (all) §8(d) & (e).

In the spring of 2015, in connection with Tops Amherst, Tops Cortland, Tops Depew, and Tops Jamestown, Keith Edwards, an asset manager for LNR, "prompted McKinley … to enter into discussions" with each of the Tops stores. McKinley, on behalf of the owner-defendants and as directed by LNR, entered into negotiations that resulted in Tops signing documents that extended their leases at their respective locations.

## STANDARD OF LAW

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, … demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

ANALYSIS

*Burden of Proof on a Claim Seeking a Commission*

Under New York law, applicable here, a plaintiff seeking a commission bears the burden of proof. *Parke-Hayden v. Loews Theatre Mgmt. Corp.,* 789 F. Supp. 1257, 1263 (S.D.N.Y. 1992); *Ditmars v. Renz*, 269 N.Y. 191, 193 (1935). A brokerage agreement awarding a commission only on new leases initiated by the broker is enforceable under New York law. *Gerald Syndicate, Inc. v. Kaye Realty Assocs.*, 187 A.D.2d 389, 389 (N.Y. App. Div. 1st Dep't 1992). It is well settled that in interpreting a contract, the Court must construe it in accord with the parties' intent. "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *Franklin Apartment Assocs., Inc. v. Westbrook Tenants Corp.*, 43 A.D.3d 860, 861 (N.Y. App. Div. 2nd Dep't 2007). It is equally well settled that any ambiguities in a contract should be resolved against the drafter. *In re Saranac Cent. Sch. Dist.*, 253 A.D.2d 566, 567, 686 N.Y.S.2d 869, 871 (N.Y. App. Div. 3rd Dep't 1998).

*Owner-Defendant' Motions for Summary Judgment*

Turning now to the motions of the owner-defendants for summary judgment with respect to the Tops Transactions at issue, each makes two arguments. First, the owner-defendants maintain, as to their respective properties, that the plain language of the Exclusive Property Leasing Agreements do not provide for commissions due and owing to Donovan since, in each case, Tops exercised "a pre-determined option." *See* Exclusive Property Leasing Agreements ¶ 8(e). Second, the owner-defendants argue that even if the Court determines that the commission exclusion does not apply, either because the lease extensions did not involve the exercise of a pre-determined option, or because there was in fact a material deviation, the

formula provided for in the agreement would result in no commission due and owing to Do-

novan.

As to the first argument, the Court disagrees with the owner-defendants and deter-

mines that the lease extension as to each of the Tops Transactions, was not the exercise of a

pre-determined option, but rather the negotiation of a new lease.

*Jamestown*

The lease renewal options are contained in paragraph 37 of the Tops' leases. The Feb-

ruary 12, 1979, lease for the Tops at Jamestown is typical. Lease, Apr. 10, 2017, ECF No. 25-

4, *attached as* Ex. A. to Fitzgerald Aff. Paragraph 37 of that lease provides in pertinent part as

follows:

> 37. Option to Renew: …[T]he Lessee shall have the right, to be exercised as hereinafter provided, to renew the term of this Lease for two (2) successive periods of ten (10) years each upon the following terms and conditions:
>
> > (1) That each renewal term, subject to the provisions of this Section, with respect to the payment of the rental established in the Section of this Lease entitled "Rental," shall be upon the same terms, covenants and conditions as this Lease provided, except that there shall be no privilege to renew the term of this Lease for any period of time beyond the expiration of the third renewal term; and
> >
> > (2) That with respect to the second and each succeeding renewal term, if any, this Lease shall have been renewed for the prior renewal term.
>
> The rental which the Lessee shall pay for the respective renewal terms shall be determined by agreement of the Lessor and the Lessee not less than six (6) months prior to the commencement of the relevant renewal term and an instrument will be executed by Lessor and Lessee setting the rental for each such rental term, such instrument to be executed not less than six (6) months prior to commencement of the relevant renewal term. If no such agreement is reached within the time stipulated, the term of the Lease or any renewal or extension thereof, as the case may be, shall terminate on its termination date.
>
> The Lessee shall exercise its rights to a renewal term in the following manner: At least twelve (12) months prior to the expiration of the initial term and at least twelve (12) months prior to the expiration of each succeeding renewal term, Lessee shall notify the Lessor of its election to exercise its right to renew the term of this Lease for the next renewal term. Upon the giving of such notice of

election, this Lease, subject to the provisions of this Section, shall be deemed to be renewed and the term thereof extended for a period of ten (10) years from the date of the expiration of the initial term or for a period of ten (10) years from the date of expiration of the then current renewal term, as the case may be, without the execution of any further lease or instrument, except as set forth in the preceding paragraph of this Section; provided, however, that in event the Lessee and the Lessor fail to agree upon rental for each such renewal in accordance with the immediately preceding paragraph herein, the term of this Lease or any renewal or extension thereof, as the case may be, shall terminate on its termination date.

Lease § 37. The February 12, 1979, lease was modified on September 9, 1996. Lease Modification and Restatement Agreement ("Lease Modification"), Apr. 10, 2017, ECF No. 25-4 *attached as* Ex. A. to Fitzgerald Aff. In the modification, the original lease was "restated in its entirety as though fully set forth" in the modification. Lease Modification ¶ 1. However, without specifically referring to the 1979 lease's paragraph 37, the Lease Modification provided additional options to the Lessee to renew:

Lessee shall have the option of renewing this Lease for an additional term of five (5) years upon the same terms and conditions except for a new rental of $34,989.52 per month, provided that the Lessor receives notice by registered or certified mail of Lessee's exercise of such option at least one (1) year prior to the expiration of this lease, time being of the essence.

Lease Modification ¶ 1(h). In addition to subparagraph (h), the Lease Modification created three additional renewal options for five years each, with the rent for those periods specified in the option. *Id*. ¶ 1(i)–(k).

On February 1, 2010, the Jamestown Tops location lease was modified again. Amendment to Lease Agreement, Apr. 10, 2017, ECF No. 25-4. This 2010 modification states that all prior leases were terminated, and the Jamestown Tops lease, at the time of this modification, is the lease dated February 12, 1979, "which has a natural expiration date of October 31, 2017…." *Id*. The 2010 lease was scheduled to terminate on January 31, 2020. *Id*. § 2.

In July 2015,[3] LB-UBS 2007-C6-Southside Station LLC entered into a Second Amendment to Lease with Tops at Jamestown. Second Amendment to Lease, Apr. 10, 2017, ECF No. 24-4. The Second Amendment to Lease with the Jamestown Tops does not mention that it was made as a result of the exercise of an option that existed under any of the prior leases. In fact, the extension period in the Second Amendment to Lease is until January 31, 2030. *Id*. ¶ 1. The Second Amendment to Lease set out new rental amounts for various periods from July 1, 2015, until January 31, 2030. *Id*. ¶ 2.

### *Depew, Cortland, and Amherst*

The Depew property's First[4] Amendment to Lease, also executed in July 2015, likewise makes no mention of exercising an option to renew any prior lease. First Amendment to Lease, Apr. 10, 2017, ECF No. 25-17. The Cortland property's Second Amendment to Lease, executed on July 28, 2015, similarly makes no mention of exercising an option to renew any prior lease. Second Amendment to Lease, Apr. 10, 2017, ECF No. 25-18. The Amherst property's Second Amendment to Lease, executed on July 17, 2015, by the LNR on behalf of the owner-defendant, and on July 28, 2015, by Tops, also makes no mention of exercising an option to renew any prior lease. Second Amendment to Lease, Apr. 10, 2017, ECF No. 25-19.

### *No pre-determined options*

Instead of memorializing Tops' exercise of pre-determined options, the negotiations between McKinley and the Tops stores at Amherst, Cortland, Depew, and Jamestown, resulted in new lease agreements. In the Jamestown lease agreement, the terms of the Second Amendment to Lease *deleted* the prior lease's options to renew paragraph. Second Amendment to Lease (Jamestown) § 6 ("**Paragraph 24** of the Lease ('*Options to Renew*') is deleted

---

[3] Tops signed on July 17, and the owner-defendants signed on July 28.

[4] Defendants did not provide a Second Amendment to Lease for Depew.

in its entirety.").[5] In the Depew amended lease, the term was extended to October 31, 2020. First Amendment of Lease (Depew), Jun. 16, 2017, ECF No. 38-11.

Further still, the owner-defendants made cash payments to the various Tops stores to induce them to continue leasing space at their respective properties. As an example, for the Depew property, the amended lease extended the lease period to September 30, 2031, from its original expiration date of approximately February 12, 1999, and the owner-defendant promised to deliver $350,000 to Tops upon execution and delivery of the amendment. First Amendment to Lease (Depew) ¶¶ 6–7, Apr. 10, 2017, ECF No. 25-17. For the Amherst and Jamestown leases, the owner-defendants promised a payment of $400,000.00 to each Tops tenant upon the execution and delivery of the Second Amendment to Lease. Second Amendment to Lease (Amherst & Jamestown) ¶ 7. For each of the leases, Tops agreed to report its gross sales. First Amendment to Lease (Depew) ¶ 5; Second Amendment to Lease (Cortland) ¶ 8; Second Amendment to Lease (Amherst & Jamestown) ¶ 5.

Therefore, as a matter of law, the Court determines that the provision in the Exclusive Leasing Agreements that contemplated no fee payable to Donovan upon the tenants' exercise of a pre-determined option to extend the lease was not activated by McKinley's negotiations with Tops. As to the owner-defendants' alternative argument, that even if the exclusion of commissions as set forth in paragraph 8(e) does not apply, the formula provided for in section 8(d) the agreement would result in no commission due and owing to Donovan, the Court also

---

[5] Thomas Fitzgerald, Vice President for Corporate Development for Tops Markets, LLC, in his affidavit of September 26, 2016, attached as Exhibit A, "complete copies of the Lease Documents" for the Jamestown Tops. Fitzgerald Aff. ¶ 2, Apr. 10, 2017, ECF No. 25-3. Included in Exhibit A are the lease agreement dated February 12, 1979, the Lease Modification and Restatement Agreement dated September 9, 1996, the Amendment to Lease Agreement dated February 1, 2010, and the Second Amendment to Lease dated July 28, 2017. The only one of those documents with a paragraph 24 is the 1979 lease. However, that lease's paragraph 24 concerns a merchants association, not an option to renew.

disagrees. Based upon the affidavit submitted by Donovan's expert, Mark Blood, CPA, [6] and

the waiver issue discussed below, the Court finds that factual issues exist as to whether com-

missions on the Tops Transactions are owed to Donovan and, if so, in what amount.

### *Donovan's Cross-Motion for Summary Judgment*

The Court determines that, as discussed below, factual issues exist which preclude a

grant of summary judgment in favor of Donovan for new Tops leases, amendments, or exten-

sions at the Amherst, Depew, Cortland, and Jamestown properties, but that factual issues

preclude granting Donovan summary judgment on those commissions.

### *Reformation of Contract*

While the owner-defendants do not raise a reformation of contract argument in support

of their respective motions for summary judgment, they do raise it as a defense to Donovan's

cross-motion for summary judgment. As to reformation, each of the owner-defendant opposes

Donovan's argument that the Exclusive Leasing Agreement made Donovan the exclusive leas-

ing agent for the properties. They contend that it was not the intent of the parties that Donovan

would do more than be responsible for leasing the empty stores at each of the properties, and

consequently, ask the Court to entertain reformation of the Exclusive Leasing Agreement.

Under New York law, a contract may be reformed on the ground of mutual mistake.

*Asset Mgmt. & Capital Co. v. Nugent*, 85 A.D.3d 947 (N.Y. App. Div. 2nd Dep't 2011). However,

> "proof of [mutual] mistake must be 'of the highest order,' [and] must 'show
> clearly and beyond doubt that there has been a [mutual] mistake' and ... must
> show with equal clarity and certainty 'the *exact and precise* form and import
> that the instrument ought to be made to assume, in order that it may express

---

[6] As discussed at oral argument, the owner-defendants argued that Blood's qualifications as a CPA did not entitle him to testify as an expert in evaluating the leasing commissions in this case. Of course, an individual can be qualified as an expert "by knowledge, skill, experience, training, or education...." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting Fed. R. Evid. 702). In that regard, the Court might need to conduct a *Daubert* hearing. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

and effectuate what was really intended by the parties'" (*Janowitz Bros. Venture v. 25–30 120th St. Queens Corp.,* 75 A.D.2d at 215, 429 N.Y.S.2d 215, quoting 13 Williston, Contracts [3d ed.], § 1548, at 125; *see Amend v. Hurley,* 293 N.Y. 587, 595, 59 N.E.2d 416).

*Id.* at 948. The law permits the Court to look outside the four corners of the contract for extrinsic evidence. *Id*.

In looking outside the Exclusive Leasing Agreement to the former contract that Donovan signed with McKinley acting on behalf of the former owners, the Court notes that the written agreement *specifically* limited Donovan's responsibilities to *vacant* space. The current leasing agreement omits that limitation. Moreover, LNR's agreement with McKinley on behalf of the owner-defendants intentionally omitted any authority for McKinley to negotiate leases. *See, e.g.,* Exclusive Property Management Agreement Commercial Property between LB-UBS 2007-C6-Henrietta Station LLC and McKinley, Inc. and McKinley Realty, LLC dated January 20, 2015, Jun. 16, 2017, ECF No. 38 ("[8] LEASING, Intentionally deleted"); Exclusive Property Management Agreement Commercial Property between LB-UBS 2007-C6- Southside Station LLC and McKinley, Inc. and McKinley Realty, LLC dated January 20, 2015 (Jamestown), Jun. 16, 2017, ECF No. 38-2 (same). This hardly supports the owner-defendants' argument that the contracting parties, now the owner-defendants, through LNR, and Donovan, meant to continue the same arrangement that McKinley had previously agreed to with Donovan. Donovan disputes the owner-defendants' contentions and the plain language of the contracts make it clear to the Court that the owner-defendants will not be able to meet the high burden of proving a mutual mistake.

*Waiver*

The owner-defendants also argue in response to Donovan's cross-motion for summary judgment that a trier of fact could find that Donovan's failure to object to McKinley's handling

of the negotiations regarding the Tops Transactions "manifested an intention by Donovan to relinquish any rights he claimed to have as a supposed 'exclusive' broker, in particular with respect to McKinley." Def.s' Mem. of Law in Opposition to Pl.'s Cross-Motion 19 n.14, Jun. 22, 2017, ECF No. 39.

Donovan argues that the owner-defendants have not clearly established that Donovan's participation in telephone conference calls about the Tops Transactions, without complaining, corresponds to Donovan's waiver of its exclusive contractual right. Pl.'s Mem. of Law 17. Further, Brian Donovan swears that he was unaware that McKinley was negotiating lease renewals with Tops, and maintains he only discovered the Tops Transactions in August 2015 when he "learned from Chris Allen, or Keith Edwards that some of the plazas were listed on an on-line commercial auction site," which provided lease abstracts. Donovan Aff. ¶ 8. Finally, he concludes, "Neither I nor any other representative of Donovan was told that Donovan was not responsible for negotiations with existing tenants. To the contrary, as set forth above, I was paid commissions for the negotiations that I had with existing tenants that resulted in lease extensions or renewals." Donovan Aff. ¶ 18. Moreover, Donovan argues that even if a representative of the company was aware of the negotiations and remained silent, that would not satisfy the Owners' burden of proof. *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 280 (N.Y. App. Div. 2nd Dep't 2017) (the intentional relinquishment of a known right, a waiver should not be lightly presumed.).

Waiver is a matter of intention and as such, not usually an issue of law, but is, instead, an issue of fact. *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37 (1917) ("A waiver, not express, found in the acts, conduct or language of a party, is rarely established as a matter of law rather than as a matter of fact."). Accordingly, issues of fact preclude granting summary judgment on the theory of waiver.

However, the Court determines as a matter of law, that Donovan is entitled to leasing commissions for the ten other non-Tops leases on which it has moved for summary judgment. Donovan has claimed these non-Tops leasing commissions amount to $48,235.14, of which the owner-defendants have paid only $600.00. Donovan Mem. of Law 19. The owner-defendants, in their admissions, stated that if Donovan was owed commissions for the following leases, the amount would be as follows:

| Lessee | Commission owed | Admission No. |
|---|---|---|
| Record Theatre | $4,396.68 | 2 (LB-UBS 2007-C6-3500 Main Street Station LLC) |
| Gak Alber Adly | $3,257.37 | 3  (LB-UBS 2007-C6-3500 Main Street Station LLC) |
| Jimmy John's | $2,735.21 | 4 (LB-UBS 2007-C6-3500 Main Street Station LLC) |
| Sally Beauty | $2,524.50 | 5 (LB-UBS 2007-C6-3500 Main Street Station LLC) |
| H & R Block | $1,827.00 | 6 (LB-UBS 2007-C6-3500 Main Street Station LLC) |
| UPS – Jamestown | $216.00 | 2 (LB-UBS 2007-C6-Southside Station LLC) |
| Cortland Federal Credit Union | $16,935.00 | 2 (LB-UBS 2007-C6-Cortland Station LLC) |
| Fred's Coin Clean, Inc. | $2,486.40 | 2 (LB-UBS 2007-C6-D&L Station LLC) |
| H & R Block | $1,570.24 | 3 (LB-UBS 2007-C6-D&L Station LLC) |
| Hallmark | $12,286.74 | 1 (LB-UBS 2007-C6-Henrietta Station LLC) |
| Total | $48,235.14 | |

Answers to Requests for Admission, May 25, 2017, ECF No. 31-23 *attached as* Ex. I to Donovan Statement of Undisputed Facts.

## CONCLULSION

For the foregoing reasons, the owner-defendants' motion for summary judgment, ECF No. 25, is denied in its entirety. Donovan's cross-motion for summary judgment, ECF No. 31, is granted in part, and denied in part. The Court grants judgment to Donovan against: (1) LB-UBS 2007-C6-3500 Main Street Station LLC in the amount of $14,740.76; (2) LB-UBS 2007-

C6-Southside Station LLC in the amount of $216.00; (3) LB-UBS 2007-C6-Cortland Station

LLC in the amount of $16,935.00; (4) LB-UBS 2007-C6-D&L Station LLC in the amount of

$4,056.64; (5) LB-UBS 2007-C6-Henrietta Station LLC in the amount of $12,286.74. How-

ever, the Court denies Donovan's application for summary judgment as it pertains to the Tops

Transactions, based only on the owner-defendants' claim of waiver.

      IT IS SO ORDERED.

Date:  December 15, 2017
        Rochester, New York      ENTER:        /s/ Charles J. Siragusa
                                                  CHARLES J. SIRAGUSA
                                                  U.S. DISTRICT JUDGE